UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MICHELLE CHALFEN,

                          Plaintiff

            -against-

EAST WILLISTON UNION FREE SCHOOL
DISTRICT, BOARD OF EDUCATION OF THE
EAST WILLISTON UNION FREE SCHOOL
DISTRICT, DR. LYNN MAZZA, individually and
in her official capacity, and DR. DANIELLE
GATELY, individually and in her official capacity,

                      Defendants.
--------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19-CV-7170 (JS) (ARL)

**LINDSAY, Magistrate Judge:**

Plaintiff, Michelle Chalfen ("Plaintiff"), brings this action for religious and age discrimination in violation of the Equal Protection Clause of the United States Constitution pursuant to 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA"). Before the Court, on referral from District Judge Seybert, is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court respectfully recommends that the motion be granted.

## BACKGROUND

### I.    Procedural History

Plaintiff commenced this action commenced this action on December 20, 2019, against defendants, East Williston Union Free School District (the "District"), the Board of Education of the East Williston Union Free School District (the "School Board"), Dr. Lynn Mazza,

individually and in her official capacity, and Dr. Danielle Gately, individually and in her official capacity (collectively, "Defendants").  An Amended Complaint was filed on May 21, 2020 asserting six causes of action: religious discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 against all Defendants (First Cause of Action), religious discrimination in violation of Title VII against District and the School Board (Second Cause of Action), religious discrimination in violation of the NYSHRL against all Defendants (Third Cause of Action), age discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 against all Defendants (Fourth Cause of Action), age discrimination in violation of the ADEA against the District and the School Board (Fifth Cause of Action) and age discrimination in violation of the NYSHRL against all Defendants  (Sixth Cause of Action). ECF No. 39.

Defendants moved for summary judgment on February 4, 2022.  ECF No. 62. The briefing schedule for Defendants' motion for summary judgment was modified several times at the parties' request and the motion was ultimately fully briefed on May 26, 2022.  In their motion for summary judgment, Defendants argue that Plaintiff has no evidence supporting an inference of discriminatory intent, Defendants had legitimate, non-discriminatory reasons to deny Plaintiff tenure, which she cannot rebut, there is no genuine issue of material fact to support Plaintiff's hostile work environment claims, Drs. Danielle Gately and Lynn Mazza (the "Individual Defendants") should be dismissed from the case because Plaintiff admits she has no direct evidence that either Dr. Gately or Dr. Mazza discriminated against her on account of age or religion and Plaintiff's *Monell* Claim should be dismissed because there is no evidence any final policymaking official discriminated against Plaintiff.  ECF No. 55.  In response, Plaintiff contends that material issues of fact preclude dismissal of Plaintiff's religious and age discrimination claims as well as Plaintiff's hostile work environment claim.  ECF No. 68.

2

By Order dated October 31, 2022, Judge Seybert referred the motion to the undersigned to issue a Report and Recommendation.

## II.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.

### A.    The Parties

Plaintiff is female of Jewish faith and Jewish ancestry who is a resident of Nassau County, New York.  Am. Compl. ¶ 7.  Plaintiff worked as a special education teacher for the District from the Fall of 2015 until July of 2019.  *Id.* at ¶ 9.   Plaintiff was 46 years old when she was hired by the District as a full-time probationary special education teacher.  Def. Rule 56.1 Statement ¶¶ 13, 18.  Prior to her employment by the District, Plaintiff worked as a part-time, non-tenured teacher in the Hewlett-Woodmere School District.  *Id.* at  ¶ 1.  In the fall of 2015, Dr. Elaine Kanas, Superintendent, recommended to the Board that Plaintiff be hired.  *Id.* at ¶¶ 14, 15.  Plaintiff was on a four-year probationary track before she would be considered for tenure.  *Id*. at ¶ 19.  When Plaintiff was hired in 2015, her direct supervisor was Shari Senzer.  *Id.* at ¶ 20.

The District is a public school district located in New York.  *Id*. at  ¶ 1.  Dr. Danielle Gately was the Director of Secondary Curriculum and Social Studies between 2014 and 2016, became the Assistant to the Superintendent in 2016, the Assistant Superintendent in 2017, and the Deputy Superintendent in 2020.  *Id*. at ¶ 36.  In July 2017, Dr. Lynn Mazza replaced Ms. Senzer as Director of Pupil Personnel Services ("PPS").  *Id.* at ¶ 65.  In that position, Dr. Mazza was Plaintiff's direct supervisor from July 2017 until Plaintiff's termination in July 2019.  *Id.* at ¶ 66.  Dr. Mazza was approximately 40 years old when she was hired.   *Id.* at ¶ 67.

### B.   Plaintiff's First Two Probationary Years

Plaintiff's first probationary teaching year was the 2015-16 academic year.  *Id*. at ¶ 43. She taught small classes or resource room, which consisted of only four students at a time, although a fifth student was added for one of her classes in one year.  *Id*. at ¶ 44.  She generally kept the same students each year.  *Id*. at ¶ 45.  On November 19, 2015, Thomas Sposato, Assistant Director of PPS, conducted an observation of Plaintiff's resource room with four students present.  *Id*. at ¶¶ 22, 46.  Mr. Sposato raised concerns about independence of the students in the class, and the tracking of prompting provided during the lesson, which he shared with Plaintiff.  *Id*. at ¶ 47.   On November 23, 2015, Dr. Karen Klapper, Assistant Principal, observed Plaintiff's resource room with three students present.  *Id*. at ¶¶ 29, 48.  Dr. Klapper noted three areas that needed improvement, which included critical questioning, having students read passages for themselves, and building students' self-esteem and confidence.  *Id*. at ¶ 49.  Dr. Klapper was critical of Plaintiff's response of "Nope" to a special education student who had answered a question incorrectly.  *Id*. at ¶ 50.   By the end of the 2015-16 academic year, Mr. Sposato had concerns about Plaintiff's data collection for prompting and the overall independence of Plaintiff's special education students.  *Id*. at ¶ 52.

Plaintiff's second probationary teaching year was the 2016-17 academic year.  *Id*. at ¶ 53.   On November 29, 2016, Ms. Senzer conducted an observation of Plaintiff's 9th Grade Special Class English class with four students.  *Id*. at ¶ 54.  Ms. Senzer offered Plaintiff some constructive criticism following this observation, including providing Plaintiff with different strategies to incorporate into future lessons.  *Id*. at ¶ 55.  On December 20, 2016, Dr. Klapper observed Plaintiff's 9th Grade Special Class English class.   *Id*. at ¶ 56.  Dr. Klapper raised three concerns about Plaintiff's performance.   *Id*. at ¶ 57.  Dr. Klapper raised concerns about Plaintiff

4

telling students how to spell words instead of having them look up words themselves. *Id*. at ¶ 58. Dr. Klapper also noted Plaintiff was not following protocols by sharing with the students the homeroom schedule of events, and not following safety protocols by properly marking the classroom for active shooter situations. *Id*. at ¶ 60. On March 17, 2017, Mr. Sposato observed Plaintiff's 9th Grade Special Class English class with four students present. *Id*. at ¶ 61. After the lesson, Mr. Sposato raised concerns about Plaintiff's use of educational terminology with Plaintiff's students. *Id*. at ¶ 62. Mr. Sposato had concerns about Plaintiff's teaching by the end of her second year. *Id*. at ¶ 64.

### C.    Plaintiff's Third Probationary Year

Plaintiff's third probationary teaching year was the 2017-18 academic year. *Id*. at ¶ 72. From the beginning of the 2017-18 school year, parents brought concerns to Dr. Mazza's attention concerning the tone and nature of the classroom environment.[1] *Id*. at ¶ 73. One parent in particular voiced a number of concerns regarding her daughter's interactions with Plaintiffs. *Id*. at ¶¶ 74-80. Defendants contend that a second parent also requested a meeting with Dr. Mazza because their son felt uncomfortable in Plaintiff's resource room, however, Plaintiff partially disputes this this contention, asserting that the student later admitted that the student felt uncomfortable because the student claimed that Plaintiff and another individual had made fun of his parents' signatures – an allegation which the student later admitted was not true. Pl. Rule 56.1 Counter Statement ¶ 81. Dr. Mazza felt Plaintiff was not responsive to reflecting on her

---

[1] Throughout Plaintiff's Rule 56.1 Counter Statement of Material Facts Pursuant to Rule 56.1, Plaintiff lodges objections in the following manner "Plaintiff objects to Defendants' Paragraph 73 on the grounds it is inadmissible hearsay. Subject to this objection, Plaintiff does not dispute the facts contained in Defendants' Paragraph 73." Since Plaintiff does not dispute the facts and because "[a]sserting an issue without advancing an argument does not suffice to adequately raise" it, *Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010), the Court declines to deem any statements inadmissible solely on the basis of Plaintiff's unsubstantiated objections. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff)*, No. 20 CV 1186-LTS, 2020 U.S. Dist. LEXIS 163546, 2020 WL 5370576, at *4 (S.D.N.Y. Sept. 8, 2020) (declining to consider an issue where a party did "not provide any explanation or proffer any support for these conclusory arguments").

approach to how she could change to support students within her classes.   Def. Rule 56.1 Statement ¶ 87.

Plaintiff was observed in 2017-18 by Dr. Mazza, Dr. Klapper, and Mr. Sposato.  *Id*. at ¶ 92.  On January 30, 2018, Dr. Klapper conducted an observation of Plaintiff's 10th Grade Special Class English class.  *Id*. at ¶ 93.  In April or May of 2018, Principal Dr. Sean Feeney observed a class in which Plaintiff's students presenting their papers as part of the school's research program.  *Id*. at ¶ 96.  Dr. Feeney was concerned that the format of the students' papers did not align with the mandated format for the 10th graders research program.  *Id*. at ¶ 97.  Dr. Feeney considered this a significant concern because it spoke to a larger issue of Plaintiff not abiding by an agreed-upon protocols by all 10th grade English teachers.  *Id*. at ¶ 98.  On May 2, 2018, Dr. Mazza observed Plaintiff's 10th Grade Special Class English class with four students. *Id*. at ¶ 99.  In Dr. Mazza's report on the observation, she stated, "Continual focus should be paid to increasing student independence through differentiation…."  *Id*. at ¶ 100.  Differentiation in the special education context is the planning and execution of tasks in a classroom that are designed to meet the individual needs of the learner.  *Id*. at ¶ 101.  After the observation, Dr. Mazza spoke with Plaintiff about the need to foster greater student independence and reduce the oversight and guidance from adults.  *Id*. at ¶ 104.  Plaintiff does not believe there were any criticisms in Dr. Mazza's report that were unfair or unwarranted.  *Id*. at ¶ 105.  On May 3, 2018, Dr. Mazza emailed Plaintiff with criticisms about the IEP goals for a particular student.  *Id*. at ¶ 106.  At this point in time, Plaintiff believed her supervisors were documenting that her IEPs were not good enough.  *Id*. at ¶ 108.

On May 2, 2018, Dr. Gately emailed Dr. Kanas to inform her of a meeting to discuss probationary staff members.  *Id*. at ¶ 109.  Dr. Gately noted that Dr. Mazza has "concerns about

6

Michelle Chalfen at the high school." *Id*. at ¶ 110.  The meeting was held on May 3, 2018, and included Dr. Feeney, Dr. Klapper, Dr. Mazza, and Steven Collier (English Department Chairperson), among others. *Id*. at ¶ 111.  Dr. Gately wrote some notes from the meeting. *Id*. at ¶ 112.  During this meeting, Dr. Mazza shared concerns regarding Plaintiff's participation in staff meetings and collaboration with other members of the department. *Id*. at ¶ 113.  Mr. Collier shared similar concerns about Plaintiff's collaborating with other English teachers. *Id*. at ¶ 114.  Dr. Gately's notes from that meeting reflect, "English teachers are not a fan." *Id*. at ¶ 115.  Dr. Feeney shared concerns about Plaintiff failing to follow a district-wide initiative regarding student research papers. *Id*. at ¶ 116.  Dr. Klapper shared concerns about Plaintiff and her membership in the overall school community, and a disconnect between what she saw in the classroom and what she should be seeing in the classroom. *Id*. at ¶ 117.  The administrators in the meeting discussed continuing to observe and offer support to Plaintiff, as she needed. *Id*. at ¶ 118.  Dr. Gately shared these concerns with Dr. Kanas, who told her to continue to observe Plaintiff and offer her support where needed. *Id*. at ¶ 119.  Mr. Sposato was beginning to see a pattern with Plaintiff in which not all students were supported with independence in mind, and, shared his concerns with Dr. Mazza. *Id*. at ¶ 120.  During the 2017-18 academic year, Dr. Mazza shared concerns with Mr. Sposato regarding Plaintiff, particularly in the areas of student independence and differentiation of instruction. *Id*. at ¶ 121.  According to Plaintiff, she did not have any conflicts with Dr. Mazza or any other supervisors during the 2017-18 academic year. *Id*. at ¶ 122.

### E.    Plaintiff's Fourth Probationary Year

The 2018-19 academic year was Plaintiff's final probationary year at the District. *Id*. at ¶ 123.  Plaintiff was assigned an integrated co-teaching "inclusion" English class for one of her

classes, with another teacher, Todd Henao. *Id*. at ¶ 124.  The rest of her classes were small classes or resource room of four or five students.  *Id*. at ¶ 125.  Plaintiff and Mr. Henao met with a consultant on co-teaching on June 6, 2018.  *Id*. at ¶ 127.  The consultant gave Plaintiff a book on co-teaching/inclusion.  *Id*. at ¶ 128.  Plaintiff had previously done co-teaching in a prior school district.  *Id*. at ¶ 129.

Dr. Gately observed Plaintiff during an English co-teaching class in October 2018 and met with Plaintiff later that day.  *Id*. at ¶ 135. Dr. Gately suggested Plaintiff observe other co-teaching teams and attend a conference on co-teaching.  *Id*. at ¶ 138.  Dr. Gately had concerns regarding Plaintiff which she shared with Dr. Mazza and Dr. Kanas.  *Id*. at ¶ 139.  Dr. Gately told Dr. Mazza and Dr. Kanas she was concerned that Plaintiff's response to her question about why she did not have a copy of the book being read in class was that she is not the English teacher.  *Id*. at ¶ 140.  Dr. Gately told Dr. Mazza that she wanted her to continue to observe Plaintiff.  *Id*. at ¶ 141.  Plaintiff asked Dr. Gately to return and observe her class again, and suggested certain dates.  *Id*. at ¶ 142.  When Dr. Gately came to observe her again, Plaintiff was absent.  *Id*. at ¶ 143. Dr. Gately anticipated Plaintiff would attempt to reschedule the observation since she was absent on that day, but she never did.  *Id*. at ¶ 144.  On October 19, 2018, Dr. Mazza observed Plaintiff in the co-teaching class.  *Id*. at ¶ 145.  During the post-observation discussion on October 23, 2018, Dr. Mazza spoke with Plaintiff about, *inter alia*, Plaintiff's role in providing opportunities for differentiation of instruction to allow the instruction and classroom activities to reach all learners.  *Id*. at ¶ 146.  Dr. Mazza suggested Plaintiff attend a conference about differentiation strategies within the inclusive classroom.  *Id*. at ¶ 147.  Dr. Mazza followed up by emailing Plaintiff with opportunities to go to conferences about differentiation strategies.  *Id*. at ¶ 148.

On December 6, 2018, Mr. Sposato was in Plaintiff's resource room with Plaintiff and five students, and Mr. Sposato felt compelled to intervene because of Plaintiff's poor strategies with a misbehaving student, which he felt would lead to further dysregulation of the student. *Id*. at ¶ 150. Mr. Sposato also did not see evidence of any planned or prepared adaptation or differentiation during this observation. *Id*. at ¶ 151. Mr. Sposato reported his concerns to Dr. Mazza. *Id*. at ¶ 152. Dr. Mazza observed Plaintiff again on December 12, 2018 in her 10th Grade Special Class English class with four students present. *Id*. at ¶ 153. Dr. Mazza noted that "[d]ifferentation of learning materials was not evident" in the lesson. *Id*. at ¶ 154. As of December 2018, Dr. Mazza had ongoing concerns regarding Plaintiff's instructional strategies. *Id*. at ¶ 155. Dr. Mazza shared her concerns about Plaintiff with Dr. Gately and Dr. Kanas. *Id*. at ¶ 156. Specifically, Dr. Mazza was concerned with Plaintiff's strategies for differentiation of instruction, as she was not differentiating appropriately for the small number of students in her classes. *Id*. at ¶ 157. Plaintiff read the report of Dr. Mazza's observation, which Plaintiff considered to be a "very bad" observation report. *Id*. at ¶ 158. Towards the end of January, Dr. Mazza and Mr. Sposato met with Plaintiff, at her request, to discuss the written observation report. *Id*. at ¶ 159. Dr. Mazza told Plaintiff the December 12, 2018 class was not a good lesson. *Id*. at ¶ 161. Plaintiff left the office abruptly and slammed the door. *Id*. at ¶ 168. Mr. Sposato expressed to Dr. Mazza he would have expected or liked to have Plaintiff acknowledge that there were areas for improvement and that she wanted support or guidance. *Id*. at ¶ 169.

Dr. Mazza's concerns regarding Plaintiff became more evident as the school year progressed. *Id*. at ¶ 171. Mr. Sposato saw a growing connection and pattern of Plaintiff, at times, not providing necessary changes to instruction to provide students to accommodate their needs. *Id*. at ¶ 172. Plaintiff's 2018-19 mid-year evaluation reflected three "Developing"

ratings: in Planning & Preparation, The Classroom Environment, and Instruction.  *Id*. at ¶ 173.

The Planning & Preparation section noted that "further development is needed with regard to

constructing lessons that account for individual student levels and provide differentiated

activities that maximize student outcomes." *Id*. at ¶ 174.  The Classroom Environment section

noted, "At times her approach has not meet the needs of all students. In the past she has struggled

with creating positive relationships with students and families, as was evidence by receipt of

parent requests this summer to have a different special education teacher for this school year."

*Id*. at ¶ 175.  The Instruction Section noted: "A large part of the role of a special education

teacher is their ability to adapt learning materials and instructional activities to meet individual

student needs. I have significant concerns with Ms. Chalfen's ability to deliver instruction in this

manner, and, in turn, its impact on the potential of the students she serves." *Id*. at ¶ 176.  The

Summary Statement/Recommendations noted: "Lesson delivery has been observed to evidence

little individualization of learning activities that closely align to achieving a specific learning

outcome and difficulty with pacing of activities." *Id*. at ¶ 177.

In addition to classroom responsibilities, part of the role of special education teachers is

the development of draft IEPs prior to meetings of the Committee on Special Education for each

student. *Id*. at ¶ 178.  Defendants saw a rapid decline in Plaintiff's IEP drafts when they began

the annual review process in January or February 2019. *Id*. at ¶ 179.  In addition, the School

Psychologist, Sheri Schettini, raised concerns about Plaintiff's IEPs. *Id*. at ¶ 182.  Defendants

contend that Dr. Mazza set up meetings with Plaintiff and others to assist Plaintiff with drafting

her IEPs, however Plaintiff disputes this fact and contends that "Plaintiff was called down to

multiple meetings with Dr. Mazza, some if not all of which were attended by Dr. Gately, wherein

Plaintiff was bombarded with criticisms of her IEP writing and repeatedly asked to resign from

her employment.  Pl. Rule 56.1 Counter Statement ¶183.  Plaintiff brought union representation

to those meetings.  Def. Rule 56.1 Statement ¶ 184.  Plaintiff told Dr. Mazza, "Listen, I write my

IEPs great" and "There was not one thing that was not done on my IEPs."  *Id*. at ¶ 187.

During the 2018-2019 academic year, Plaintiff was absent 25.5 days.[2]  *Id*. at ¶ 192.  As

Plaintiff acknowledges, consistency in the classroom and being present as much as possible for

the students is extremely important.  *Id*. at ¶ 190.  Plaintiff contends that the number of days she

took off in her fourth probationary year was "[a] lot different than [her] first three years" due to

anxiety.  Pl. Rule 56.1 Counter Statement ¶ 191.  Plaintiff admits this was "absolutely … a lot of

time" for a teacher to take off.  De. Rule 56.1 Statement ¶ 196.

### G.    **Plaintiff's Final Evaluation and Denial of Tenure**

Evaluations for tenure are based on all four probationary years of a teacher's

employment.  *Id*. at ¶ 197.  By the spring of 2019, Mr. Sposato had the professional

opinion that Plaintiff should not be recommended for tenure.  *Id*. at ¶ 198.  Mr. Sposato

was concerned that Plaintiff failed to acknowledge the areas she needed to improve, and

the administration's effort to support her.  *Id*. at ¶ 199.  Mr. Sposato also felt Plaintiff was

not meeting some professional responsibilities in support of students, including her poor

performance on IEPs and writing goals.  *Id*. at ¶ 200.   For example, Mr. Sposato

documented on one IEP, authored by Plaintiff, the reading goal is "not measurable, and is

not a goal at all rather a present level of performance. The present levels of performance

and needs section was minimal and I had to expand those sections to reflect a more robust

snapshot of [the student's] performance in school. The need as stated for inferential

question did not make sense to me and I adjusted it."  *Id*. at ¶ 201.

---

[2] This included 13.5 sick days and 10 days for "family illness."  *Id*. at ¶ 193.  Plaintiff admitted that none of her family members were sick during that year.  *Id*. at ¶ 194.

In the role of PPS director, Dr. Mazza submitted a form to Dr. Kanas containing information for Board to consider a teacher's candidacy for tenure.  *Id*. at ¶ 202.  Dr. Gately was not involved in the Superintendent's tenure recommendation.  *Id*. at ¶ 203.  Dr. Kanas, in turn, submits a tenure recommendation to the Board.  *Id*. at ¶ 204.  On April 1, 2019, Dr. Mazza recommended against Plaintiff receiving tenure.  *Id*. at ¶ 205.  Dr. Mazza had instructional concerns with Plaintiff's ability to differentiate instruction for her students.  *Id*. at ¶ 206.  Dr. Mazza had concerns about Plaintiff's receptiveness and responsiveness to student needs, and her ability to change her approach based on the feedback and input.  *Id*. at ¶ 207.  Dr. Mazza had concerns with Plaintiff's ability to uphold various professional responsibilities, including timely and complete paperwork related to the committee on special education process.  *Id*. at ¶ 208.  Based on these concerns, on April 26, 2019, Dr. Kanas sent Plaintiff a letter stating her intention not to recommend Plaintiff for tenure.  *Id*. at ¶ 209.  If administrators have any doubt about a teacher, the administration errs on the side of denying tenure.  *Id*. at ¶ 210.  In response to Plaintiff's request, Dr. Kanas sent her a letter on May 13, 2019 explaining the reasons for her recommendation against tenure.  *Id*. at ¶ 211.  The reasons for Dr. Kanas' recommendation included:

> a. Plaintiff's failure to differentiate and individualize instruction that would promote student engagement and build confidence.
>
> b. Multiple parental complaints and concerns regarding their children, suggestive of a judgmental and critical learning environment where students felt uncertain.
>
> c. That parents expressed concern regarding their children's overall success academically, socially, and emotionally within the classroom through Plaintiff's

instruction.

d. Parents request to place their children with a different teacher.

e. Plaintiff had difficulty with the pacing of activities.

f. Plaintiff was advised to utilize collaboration, self-reflection, and goal setting with students to build student confidence and self-reliance, but she failed to do that.

g. Concerns at the end of the 2018-19 academic year with Plaintiff's completion of professional responsibilities.

h. Despite sharing concerns about the development of IEPs, providing Plaintiff with a guidance document developed by the New York State Department of Education, and giving Plaintiff many opportunities to meet to review any questions or concerns Plaintiff had regarding satisfactory IEP development, little improvement was noted.

*Id*. at ¶ 212.  The parties agree that Dr. Kanas will always recommend against tenure whenever there is any doubt about a teacher.  *Id*. at ¶ 213.  Plaintiff received four "Developing" ratings on her 2018-19 end-of-year evaluation.  *Id*. at ¶ 214.  The Summary Statement/Recommendations noted "Significant concerns exist at present across all domains. Ms. Chalfen's difficulty following through on professional responsibilities has led to difficulty planning accordingly for her students. Her colleagues have needed to support this process in various ways. It appears as though Ms. Chalfen's difficulty identifying individual student needs negatively impacts her ability to plan lessons that incorporate differentiation, adequate pacing, and appropriate levels of cognitive challenge. As a result student engagement is impacted and learning objectives are not

fully met." *Id*. at ¶ 215.  On June 17, 2019, the Board voted to terminate Plaintiff's employment, effective July 18, 2019, in accordance with Dr. Kanas' recommendation. *Id*. at ¶ 216.

H.    **The Alleged Discriminatory Conduct**

Plaintiff has never personally heard Dr. Mazza, Dr. Gately or Dr. Kanas say anything disparaging about the Jewish religion.  *Id*. at ¶¶ 255-57.  Plaintiff has never been told by others that that Dr. Mazza, Dr. Gately, or Dr. Kanas ever said anything disparaging about Jewish people.  *Id*. at ¶ 259.  Plaintiff candidly admits that she has never heard any administrators in the District speak disparagingly about Jewish people, *id*. at ¶ 260, and no one in Plaintiff's union ever suggested that her religion may have played a role in her not being recommended for tenure.  *Id*. at ¶ 261.  Indeed, Plaintiff does not have any specific evidence that Dr. Mazza, Dr. Gately or anyone else in the District discriminated against her on account of religion(or age), but rather believes there was a pattern of older Jewish employees who were either terminated or something negative happening to them.  *Id*. at ¶ 217.

Plaintiff lists the following individuals that she believes evidence this pattern: Shari Senzer, Jeffrey Lesser, Greg Wasserman, Justine Meyer, Susan Checkla, Stephen Kimmel, and Karen Stein.[3]  *Id*. at ¶ 218.  However, other than Shari Senzer, who Plaintiff knew from her previous employment and with whom she socialized, Plaintiff does not know the religion of any of the individuals listed.  *See, e.g., id*. at ¶ 226 (Plaintiff does not have any personal knowledge of Dr. Lesser's religion, other than guessing by his last

---

[3] Dr. Mazza was not involved in employment decisions regarding any of the aforementioned individuals.  *Id*. at ¶ 219.  Dr Gately was not involved in employment decisions regarding Shari Senzer, Jeffrey Lesser, Greg Wasserman, Justine Meyer, or Susan Checkla.  *Id*. at ¶ 220.

14

name); *id*. at ¶ 231  (same for Mr. Wasserman);  *id*. at ¶ 239 (same for Ms. Meyer); *id*. at ¶ 251 (same for Mr. Kimmel); *id*. at ¶ 253 (same for Ms. Stein).[4]

- Ms. Senzer resigned from the District in 2017.  *Id*. at ¶ 221.  Ms. Senzer never suggested to Plaintiff that she felt she was the subject of discrimination.  *Id*. at ¶ 222.  Ms. Senzer does not know Dr. Mazza.  *Id*. at ¶ 223.  Dr. Gately never said or did anything that Ms. Senzer perceived to be age discriminatory or anti-Semitic.  *Id*. at ¶ 224.

- Dr. Lesser resigned from the District in 2015.  *Id*. at ¶ 225.  Plaintiff does not know anything about Dr. Lesser's work performance or evaluations.  *Id*. at ¶ 227.  Plaintiff does not have any information of the facts and circumstances surrounding Dr. Lesser's termination.  *Id*. at ¶ 228.  Plaintiff does not have any information suggesting Dr. Lesser had been discriminated against.  *Id*. at ¶ 229.

- Mr. Wasserman was a tenured faculty member in the District who resigned in 2017 so he could accept an administrative position for more money in the Roslyn Union Free School District.  *Id*. at ¶¶ 230, 232.  Mr. Wasserman was not denied tenure, he left on his own accord.  *Id*. at ¶ 233.  According to District records, Mr. Wasserman was under 40 years old when he resigned.  *Id*. at ¶ 234.

- Justine Meyer worked as a guidance counselor for the District for one year, 2018-19.  *Id*. at ¶ 235.  Plaintiff did not know Ms. Meyer very well.  *Id*. at ¶ 236.  According to District records, Ms. Meyer was born in 1986;

---

[4] There is no discussion of the basis for Plaintiff's belief that Ms. Checkla is Jewish.

so she was in her early 30s.  *Id*. at ¶ 237.  Plaintiff does not know anything about Ms. Meyer's performance.  *Id*. at ¶ 238.

- Susan Checkla was never an employee of the District.  *Id*. at ¶ 240.  Ms. Checkla was a contracted communications services consultant, who worked with the District pursuant to annual contracts, the most recent of which ended on June 30, 2017.  *Id*. at ¶ 241.  Plaintiff has no personal knowledge of the circumstances under which Ms. Checkla no longer performed work for the District.  *Id*. at ¶ 242.

- Stephen Kimmel was the tenured Principal of The Willets Road School in 2018.  *Id*. at ¶ 244.  In July 2018, the parents of a minor student served a notice of claim on the District, naming Stephen Kimmel and Karen Stein as Respondents.  *Id*. at ¶ 243.  After the notice of claim was filed, Mr. Kimmel moved to a different administrative position within the District, but is still employed as an administrator.  *Id*. at ¶ 249.  Mr. Kimmel is at the same salary scale level, with the same benefits, as when he was assigned as Principal.  *Id*. at ¶ 250.

- In 2018, Karen Stein was a Guidance Counselor at The Willets Road School.  *Id*. at ¶ 245.  In July 2018, the parents of a minor student served a notice of claim on the District, naming Stephen Kimmel and Karen Stein as Respondents.  *Id*. at ¶ 243.  After this notice of claim was filed, Ms. Stein retired.  *Id*. at ¶ 248.  Plaintiff has never spoken to Ms. Stein in her life.  *Id*. at ¶ 252.  Plaintiff has no personal knowledge of the circumstances under which Ms. Stein retired.  *Id*. at ¶ 254.

Plaintiff admits that no one in the District expressed any hostility on account of Plaintiff's age or religion and that Plaintiff never complained to the District that she was being treated unfairly on account of her religion. *Id*. at ¶¶ 262, 263. Defendants point out, and Plaintiff acknowledges, that the District has tenured Jewish faculty, however, the District does not solicit or maintain records of the religions of its employees. *Id*. at ¶¶ 264, 266. Plaintiff has offered no statistics demonstrating that Jewish teachers were terminated at a different rate than non-Jewish teachers. *Id*. While Plaintiff bases her belief on a pattern on the surnames of the aforementioned employees, many of the surnames of District's teachers and administrators also sound Jewish. *Id*. at ¶ 268.

Similarly, Plaintiff has provided no evidence of age discrimination. Plaintiff was 46-years old when she was hired. *Id*. at ¶ 269. Nobody in the District expressed any hostility on account of Plaintiff's age, *id*. at ¶ 270, and nobody in Plaintiff's union ever suggested that her age may have played a role in her not being recommended for tenure. *Id*. at ¶ 271. Plaintiff never complained to the District that she was being treated unfairly on account of her age. *Id*. at ¶ 272. Plaintiff has not offered any statistical analysis to suggest older teachers were terminated at any different rate than younger teachers. *Id*. at ¶ 273. According to Defendants, in the 2018-19 school year, 126 of the 208 faculty members were turning at least 40 years of age, which is greater than 60%. *Id*. at ¶ 274. Indeed, in the 2018-19 school year, more than half of the District's administrators and teaching staff was over 40 years old over 34% turned at least 50 years old that year. *Id*. at ¶ 275, 276. In the 2018-19 school year, 23 of the 208 faculty members were at least 60 years old that year (over 11%). *Id*. at ¶ 278.

**DISCUSSION**

## I. Standard of Law

### A. Summary Judgment

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 U.S. Dist. LEXIS 133281, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not rest upon conclusory allegations or denials but must set forth "concrete particulars" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp*., 585 F.2d 31, 33 (2d Cir. 1978)); *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) ("there must exist 'specific facts showing

that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim") (quoting *Celotex,* 477 U.S. at 322); *E.E.O.C. v. Mavis Discount Tire, Inc.,* 129 F. Supp. 3d 90, 102 (S.D.N.Y. 2015) ("the nonmoving party must 'set out specific facts showing a genuine issue for trial' using affidavits or otherwise, and cannot rely on the 'mere allegations or denials' contained in the pleadings). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

However, "[t]he Second Circuit has 'explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment [in employment discrimination cases] because the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication.'" *Greenberg v. State Univ. Hosp.-Downstate Med. Ctr.*, No. 15 CV 2343 PKC VMS, 2019 U.S. Dist. LEXIS 167956, 2019 WL 4752018, at *13 (E.D.N.Y. Sept. 29, 2019)(citing *Thompson v. Kaufman's Bakery, Inc.,* No. 03-CV-340 (WMS), 2005 U.S. Dist. LEXIS 22431, 2005 WL 643433, at *3 (W.D.N.Y. March 16, 2005)). Nevertheless, "summary judgment remains appropriate in discrimination cases, as 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation.'" *Singh v. New York State Dep't of Taxation & Fin*., 911 F. Supp. 2d 223, 233 (W.D.N.Y. 2012) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## B. Differences Between Claims §1983, Title VII, ADEA and NYSHRL

As previously stated, Plaintiff has asserted claims under Title VII, the ADEA. the NYSHRL and the Fourteenth Amendment, as enforced by 42 U.S.C. § 1983. Title VII prohibits employers from discriminating against an individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "'To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that '(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.'" *Mercedes v. AVA Pork Prod., Inc.*, No. 13-CV-3212 (JFB) (AKT), 2014 U.S. Dist. LEXIS 48416, 2014 WL 1369611, at *5 (E.D.N.Y. Apr. 8, 2014) (citing *Chang v. N.Y.C. Dep't for the Aging,* No. 11 Civ. 7062(PAC) (JLC), 2012 U.S. Dist. LEXIS 50436, 2012 WL 1188427, at *4 (S.D.N.Y. Apr. 10, 2012). "New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII, and thus, claims under the NYHRL and under Title VII are essentially identical." *Allen v. Advanced Digital Info. Corp.*, 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007) (citing *Brown v. County of Oneida*, 41 F. Supp. 2d 172, 180 (N.D.N.Y. 1999)).

42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To establish a claim under Section 1983, a plaintiff must prove that "(1) the challenged conduct was

attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317 (E.D.N.Y. 2014) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)). Where a plaintiff asserts a claim under the Fourteenth Amendment Equal Protection Clause, that claim generally parallels the Title VII discrimination claim once the color of law requirement has been met. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015).

Nonetheless, the Second Circuit has outlined several ways in which Title VII and § 1983 remain different and those differences warrant mention.

In *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019), the Second Circuit noted:

> First, and most obviously, a plaintiff advancing a claim pursuant to § 1983 must plausibly allege that 'the alleged deprivation was committed by a person acting under color of state law.' Title VII has no such requirement. Second, unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination. Third, while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles, § 1983 does not permit such vicarious liability. 'If [an individual] defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.'

934 F.3d at 212 (citations omitted). The *Naumovski* Court also highlighted a fourth distinction between the statutes which it characterized as "crucial." Specifically, the Second Circuit cautioned:

> the disparate treatment provision of Title VII is unusual in that it [generally] incorporates a 'lessened causation standard.' Under Title VII, a plaintiff may succeed simply by establishing that [a protected characteristic] was a 'motivating factor for any employment practice, even though other factors also motivated the practice.' Thus, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII. In other words, an employer's insistence that he would have terminated the plaintiff anyway is no defense. . . .

Not so § 1983. As the Supreme Court has explained, a 'standard requirement of any tort claim' is that plaintiff show 'that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct. . ..' It follows, therefore, that a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment.  It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct. Accordingly, a court considering a § 1983 claim at summary judgment must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' [the] discrimination.

934 F.3d 200, 213–14.

To establish a prima facie case of age discrimination under the ADEA plaintiff must show that: (1) she is over 40; (2) she was qualified for the job for which she applied; (3) she was not hired; and (4) the failure to hire occurred under circumstances raising an inference of age discrimination. Id. at 195. The burden then shifts to the defendants to produce evidence of a legitimate, nondiscriminatory reason for the failure to hire. Id. To make out a prima facie case of age discrimination under the ADEA, the plaintiff has the heightened burden of showing "'by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Green v. Town of E. Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 106 (2d Cir. 2010) (discussing the prima facie case in the context of age discrimination); *see also O'Connor v. Consol. Coin Caterers Corp*., 517 U.S. 308, 312-13, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996) (" [T]he prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . .' In the age-discrimination context, such an inference cannot be drawn

from the replacement of one worker with another worker insignificantly younger." (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977))); *see also Eng v. Beth Isr. Med. Ctr.*, 93 Civ. 3605 (RPP), 1995 U.S. Dist. LEXIS 11155, 1995 WL 469704, at *2-3 (S.D.N.Y. Aug. 4, 1995).

Although the Court must be careful to account for the higher burden associated with § 1983 claims, the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) still applies to each of these claims. Under *McDonnell Douglas*, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, and, thus, (3) the burden shifts back to the plaintiff to show that the employer's reason is pretextual and that it masks the employer's true discriminatory reason. *See Patterson v. City of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). While intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

## II.   Analysis

### A.   Plaintiff's Claims of Religious and Age Discrimination Pursuant to Section 1983

Plaintiff has asserted claims of religious and age discrimination in violation of the Equal Protection Clause pursuant to Section 1983 against each of the Defendants. Am Compl. Counts One and Four. With respect to Plaintiff's claims asserted against the Individual Defendants, as discussed above, "[i]n order to establish individual liability under § 1983, a plaintiff must show

23

Case 2:19-cv-07170-JS-ARL   Document 75   Filed 02/27/23   Page 24 of 36 PageID #: 2586

(a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir. 2004). Additionally, "'[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Id.* (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).

In their motion for summary judgment, Defendants argued that Plaintiff had failed to allege personal involvement of either of the Individual Defendants in the alleged discrimination. Def. Mem. at 22. In response to Defendants' motion for summary judgment, Plaintiff has failed to respond to Defendants' arguments that the claims against the Individual Defendants are not supported factually. "Where, as here, a counseled non-moving party submits 'a partial response arguing that summary judgment should be denied as to some claims while not mentioning others,' that response 'may be deemed an abandonment of the unmentioned claims.'" *Camarda v. Selover*, 673 Fed. App'x. 26, 30 (2d. Cir. 2016) (summary order) (quoting *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014)); *see also Dominion Capital LLC v. ShiftPixy, Inc.,* No. 19 Civ. 6704 (PGG), 2019 U.S. Dist. LEXIS 204428, 2019 WL 7599907 (S.D.N.Y. Nov. 22, 2019) ("An opposing party's failure to address a claim on summary judgment may be found to be abandonment"). "Abandonment, arising from the non-moving party's failure to address certain claims in an opposition to a summary judgment motion, is distinguishable from that party's failure to submit such an opposition, where this Court must nonetheless determine whether summary judgment is appropriate." *Avola v. Louisiana-Pacific Corp.,* 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013); *see also Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted

24

on that basis alone").  Therefore, Defendants' motion for summary judgment on Plaintiff's

claims under Section 1983 against the Individual Defendants should be granted.

Additionally, Defendants have moved for summary judgment with respect to Plaintiff's

claims against the District and the School Board pursuant to Section 1983 because to prevail on a

§ 1983 claim against a municipality, a plaintiff must demonstrate that the alleged constitutional

violation resulted from a specific municipal policy, practice or custom, *Monell,* 436 U.S. at 694,

or the act of "decisionmaker [who] possesses final authority to establish municipal policy with

respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  Def.

Mem. at 22.  In *Monell*, the Supreme Court held that a local government may not be held liable

under § 1983 for an "injury inflicted solely by its employees or agents." 436 U.S. at 694, 56 L.

Ed. 2d 611.  In other words, local government entities "are not vicariously liable under § 1983

for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359, 179 L.

Ed. 2d 417 (2011). Instead, "[p]laintiffs who seek to impose liability on local governments under

§ 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.*

(quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018).  In their motion for summary judgment

Defendants argue that Plaintiff's *Monell* claim should be dismissed, as there is no evidence any

final policymaking official discriminated against Plaintiff.  Def. Mem. at 23.  Once again,

Plaintiff has failed to respond to this argument, and therefore Plaintiff's 1983 claims for religious

and age discrimination asserted against the District and the School Board set forth in the first and

fourth causes of action are deemed abandoned.

Thus, the undersigned respectfully recommends that Defendants' motion for summary

judgment with respect to Plaintiff's Section 1983 discrimination claims, First Cause of Action

and Fourth Cause of Action, be granted as to all Defendants.

### B.    Plaintiff's discrimination claims under Title VII, ADEA and NYSHRL[5]

Plaintiff has asserted claims of religious discrimination in violation of Title VII against the District and the School Board, claims of age discrimination in violation of the ADEA against the District and the School Board and claims of religious and age discrimination in violation the NYSHRL against each of the Defendants.[6]  Am Compl. Counts Two, Three, Five and Six.

With respect to Plaintiff's claims under the NYSHRL against the Individual Defendants, "an employee may not be individually subject to suit as an employer under Section 296(1) of the [NYS]HRL 'if he [or she] is not shown to have any ownership interest or any power to do more than carry out personnel  decisions made by others.'" *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 379 (S.D.N.Y. 1999)(quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984)); *see also Wyche v. Niskayuna Central Schl. Dist.*, No. 1:18-CV-567 (LEK/CFH), 2018 U.S. Dist. LEXIS 105284, 2018 WL 3105065 (N.D.N.Y. June 22, 2018) ("insofar as plaintiff is attempting to allege that [defendant's] failure to award him a full-time position due to his race, apparently in violation of NYSHRL, as indicated above, plaintiff must allege that [defendant] had the power to hire or fire him in order

---

[5] As discussed above, religious discrimination claims under the NYSHRL are governed by the same standards as claims under Title VII, therefore, the Court considers the two together. *See, e.g. Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir.1999). Similarly, Plaintiff's NYSHRL age discrimination claims are governed by the same standard as Plaintiff's ADEA claims. *See Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 71 n.2 (2d Cir. 2004) ("Since the [NYSHRL] mirrors the requirements of the ADEA, violation of one necessarily implies violation of the other").

[6] A plaintiff who wishes to bring Title VII and ADEA claims must first file an EEOC discrimination charge.  Plaintiff must file that charge as to ADEA claims, and in New York, as to Title VII claims, within 300 days of the date of the alleged unlawful employment practice.  *See Vega,* 801 F.3d at 78-79 (Title VII claims); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325-29 (2d Cir. 1999) (ADEA claims); *see also Francis v. Elmsford School Dist.*, 442 F.3d 123, 126 (2d Cir. 2006); *Hodge v. New York Coll. of Podiatric Medicine*, 157 F.3d 164, 167-68 (2d Cir. 1998).  Neither party has addressed the timeliness of Plaintiff's claims, however, the Court notes that Plaintiff has not alleged that EEOC discrimination charges have been filed.  While, a district court "may dismiss an action *sua sponte* on limitations grounds in certain circumstances where 'the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." *Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 293 (2d Cir. 2011), rather than recommend dismissal on this basis, the undersigned recommends that in the event the District Court fails to adopt the recommendation that summary judgment be granted,  further briefing on the issue of the statute of limitations be required.

to bring a NYSHRL claim against him.").  "[A] co-worker who lacks the authority to either hire or fire the plaintiff may still be held liable as an aider-abettor under NYSHRL § 296(6) if he actually participates in the conduct giving rise to a discrimination claim." *Figueroa v. RSquared NY, Inc*., 89 F. Supp. 3d 484, 493 (E.D.N.Y. 2015).  Plaintiff has failed to allege that either Individual Defendant had the power to hire or fire Plaintiff, or that the Individual Defendants are liable as aider-abettors.  Accordingly, the undersigned respectfully recommends that Plaintiff's claims under Title VII and the NYSHRL against the Individual Defendants be dismissed.

With respect to Plaintiff's claims against the District and the School Board, "'[t]o establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that '(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.'" *Mercedes v. AVA Pork Prod., Inc*., No. 13-CV-3212 JFB AKT, 2014 WL 1369611, at *5 (E.D.N.Y. Apr. 8, 2014) (citing *Chang v. N.Y.C. Dep't for the Aging,* No. 11 Civ. 7062(PAC) (JLC), 2012 WL 1188427, at *4 (S.D.N.Y. Apr. 10, 2012).  Similarly, to establish a prima facie case of age discrimination under the ADEA, the plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193, 2007 WL 587249, *2 (2d Cir. 2007).  "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in [age or religious based] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to" the

adverse employment action. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (citation omitted); *see also  Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (same).

Defendants do not challenge the first three elements of either claim, but rather Defendants contend that Plaintiff has no evidence supporting an inference of discriminatory intent.  Def. Mem. at 4-5.  Defendants point out that Plaintiff does not claim anyone ever said or did anything that was in any way indicative of age or religious discrimination.  Def Mem. at 5-7; Def. Reply at 2.  Similarly, according to Defendants, Plaintiff does not allege more favorable treatment of any other individual outside her protected categories.  Def. Reply at 2.  Plaintiff does not dispute these contentions.  Rather, Plaintiff argues that she received positive received positive performance evaluations for her first three probationary years, and then, beginning in "Plaintiff's fourth probationary year, the administrators and her supervisors began to harshly criticize Plaintiff's performance in areas of teaching where she had excelled, despite the fact that Plaintiff had not done anything to change how she performed her job responsibilities."  Pl. Mem. at 12.  In addition, Plaintiff argues that there was a pattern and practice at the District to target Jewish and/or older employees and subject them to adverse employment actions.  *Id*.

First, Plaintiff's argument that her positive evaluations suddenly turned negative in her fourth year, is not supported by the evidence and does not support a claim of discrimination. According to Plaintiff "beginning in Plaintiff's fourth probationary year at the School, the administrators and her supervisors began to harshly criticize Plaintiff's performance in areas of teaching where she had excelled, despite the fact that Plaintiff had not done anything to change how she performed her job responsibilities."  Pl. Mem. at 11.  Accepting this conclusory assertion as true, Plaintiff nevertheless fails to point to any facts supporting a conclusion that the

alleged change in the evaluation of her performance was the result of discrimination.  However, despite Plaintiff's conclusion otherwise, there is unrefuted evidence in the record indicating that while she was given largely positive feedback during her first three years, there were less than positive critiques made as well.  For example, on November 19, 2015, during Plaintiff's first year, Thomas Sposato, Assistant Director of PPS, conducted an observation of Plaintiff's resource room with four students present and raised concerns about independence of the students in the class, and the tracking of prompting provided during the lesson, which he shared with Plaintiff.  *Id*. at ¶¶ 22, 46, 47.  By the end of the 2015-16 academic year, Mr. Sposato had concern about Plaintiff's data collection for prompting and the overall independence of Plaintiff's special education students.  *Id*. at ¶ 52.  Dr. Karen Klapper, Assistant Principal, identified several areas that needed improvement during Plaintiff's first three years, such as telling students how to spell words instead of looking them up, not following school protocols, and not having students read for themselves. At the end of Plaintiff's third year, Dr. Klapper shared concerns with other administrators about Plaintiff's membership in the school community, and a disconnect in the classroom. Plaintiff does not believe any of Dr. Klapper's evaluations were unfair or unwarranted.  *Id.* at ¶¶ 30, 32, 33, 34, 35, 49, 50, 57-60, 94-95, 117. On March 17, 2017, the end of Plaintiff's second year of teaching, Mr. Sposato observed Plaintiff's 9th Grade Special Class English class with four students present.  *Id*. at ¶ 61.  After the lesson, Mr. Sposato raised concerns about Plaintiff's use of educational terminology with Plaintiff's students and had concerns about Plaintiff's teaching by the end of her second year.  *Id*. at ¶¶ 62, 64.  In May 2018, Dr. Mazza noted Plaintiff should work on "increasing student independence through differentiation," criticisms Plaintiff did not believe were unfair or unwarranted.  It also is undisputed that several administrators shared their concerns about her at a

meeting at the end of her third year.  *Id.* at ¶¶ 109-121.  Thus, far from the glowing reviews suggested by Plaintiff, the undisputed facts indicate that Plaintiff's performance in the classroom had been criticized on more than one occasion during her first three years of teaching.

Next, Plaintiff argues that there was a pattern and practice at the District to target Jewish and/or older employees and subject them to adverse employment actions.  Pl. Mem. at  12-13.  Generally, a plaintiff's reliance on proof of an alleged pattern of discrimination against other members of a plaintiff's protected class is not alone sufficient to meet a plaintiff's burden of persuasion under the McDonnell Douglas framework.  *Pollock v. Shea*, 568 F. Supp. 3d 500, 512 (S.D.N.Y. 2021); *see also Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 149 (2d Cir. 2012) (reasoning that "[p]ermitting private plaintiffs to use the pattern-or-practice method of proof outside the class action context" would "conflict with the Supreme Court's oft-repeated holding in the context of disparate-treatment, private nonclass litigation that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" (internal quotation marks & citation omitted)).  "The Second Circuit has cautioned against attributing much, if any, significance to the fact that another member of the protected class suffered an adverse employment action along with a plaintiff." *Clarke-Green v. N.Y.C. Dep't of Educ.*, 17 Civ. 778 (EK) (VMS), 2022 U.S. Dist. LEXIS 138449, 2022 WL 4643385 (E.D.N.Y. Aug. 2, 2022) (citing *Zimmermann v. Assocs. First Cap. Corp.,* 251 F.3d 376, 382 (2d Cir. 2001)).

"To make out a prima facie claim of [unlawful discrimination], the plaintiff must meet the first three elements of the McDonnell Douglas test and must demonstrate 'that a similarly situated employee not in the relevant protected group received better treatment.'" *Smith v. New Venture Gear, Inc*., 320 Fed.Appx. 33, 35 (2d Cir. 2009) (quoting *McGuinness v. Lincoln Hall,*

263 F.3d 49, 53 (2d Cir. 2001)); *see also Kampmier v. Emeritus Corp*., 472 F.3d 930, 938 (7th Cir. 2007) (because plaintiff failed to identify a similarly situated individual whom her employer treated differently, district court properly granted employer's motion for summary judgment dismissing plaintiff's claim of disability discrimination).  Plaintiff does not identify any younger non-Jewish teachers that were granted tenure after a series of unfavorable evaluations.  "Because Plaintiff has not offered evidence to establish that there are any alleged comparators who were similarly situated to her, but who were alleged to have been treated differently than her, Plaintiff cannot prove an inference of discrimination as part of her prima facie case of . . . discrimination." *Clarke-Green,* 2022 U.S. Dist. LEXIS 138449.

However, even if the Court were to accept Plaintiff's contention that a pattern could give rise to an inference of discriminatory intent, Plaintiff has failed to provide any evidence supporting her contention.  Plaintiff admitted the bulk of the facts in Defendants Rule 56.1 Statement relating to the purported pattern and practice at the District to target Jewish and/or older employees.  *See* Def. Rule 56.1 Statement ¶¶ 217–268.  Plaintiff admitted in her deposition that she is unaware of the religion of many of the individuals she has identified in the Complaint. *See, e.g.*, *id*. at ¶¶ 226, 231, 239, 251, 253.  In addition,  several of the individuals identified by Plaintiff as part of the pattern of adverse employment actions against older Jewish employees are not in fact, within the age protected class.  *See, e.g.*, *id*. ¶¶ 231, 234, 237, 239.  Indeed, Plaintiff has not provided anything other than her own conclusion that a pattern of adverse employment actions against older Jewish employees exists.  This conclusion is simply not enough to create a genuine issue of material fact.  *See Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 101 (2d Cir. 2010) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."); *Smalls v. Allstate Ins. Co.,* 396 F. Supp.

2d 364, 371-72 (S.D.N.Y. 2005) ("[P]laintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." (citations omitted)).

Plaintiff's age discrimination claim is further undermined because, as Defendants point out, Plaintiff was already a member of the protected age class when Defendants hired her.  *See, e.g., Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 (2d Cir. 1981) (finding no direct evidence of age discrimination when Plaintiff "was taken into the company at the executive level when he was already 11 years into the [protected] age bracket"); *Snowden v. Trs. of Columbia Univ.,* 12 Civ. 3095 (GBD), 2014 U.S. Dist. LEXIS 42543, 2014 WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), aff'd, 612 F. App'x 7 (2d Cir. 2015) ("Where, as here, an employee is already a member of the protected class when hired, any inference of age discrimination when her employment is terminated is undermined.").

Moreover, even assuming arguendo that Plaintiff could successfully establish a prima facie case, Defendants have established a legitimate and non-discriminatory rationale for her termination.  The reasons are set forth in Dr. Kanas' May 13, 2019 letter included, *inter alia*, the following: failure to differentiate and individualize instruction; multiple parental complaints and concerns that suggested a judgmental and critical learning environment; parental concerns regarding their children's overall success academically, socially, and emotionally within the classroom; parental requests to place their children with a different teacher; Plaintiff's difficulty with the pacing of activities; Plaintiff failing to utilize collaboration, self-reflection, and goal setting with students to build student confidence and self-reliance, as she was instructed to do; concerns at the end of the 2018-19 academic year with Plaintiff's completion of professional responsibilities; Plaintiff's failure to improve her IEPs, despite her being notified of concerns,

32

provided with a guidance document developed by the N.Y.S. Dep't of Education, and being given many opportunities to meet to review any questions or concerns. Def. Rule 56.1 Statement ¶¶ 117, 212.  Similar concerns were shared on Plaintiff's 2018-19 end-of-year evaluation.  Id. at ¶¶ 170-71.

In response, Plaintiff argues that she is not required to demonstrate the proffered reason for her termination was false, but only that a discriminatory motive played a role in the decision. Pl. Mem. at 13.  To demonstrate a discriminatory motive, Plaintiff once again relies on her conclusion that there exists "a longstanding pattern and practice enforced at the District whereby older and/or Jewish employees are subjected to adverse action and, often, pushed to leave their roles in lieu of being granted tenure."  Pl. Mem. at 14.  For the reasons discussed above, this conclusion is insufficient to establish a discriminatory motive.  Additionally, Plaintiff argues that Defendants did not fully apprise her, or give her specific examples, regarding her poor performance. However, Defendants' criticisms were well documented in Plaintiff's observation reports.  Def. Rule 56.1 Statement ¶¶ 46-47, 49-51, 54-63, 92-105, 146-47, 154, 160, 177.  Thus, Plaintiff has failed to show that the legitimate, non-discriminatory reasons for her termination advanced by Defendants were a pretext.

Plaintiff has failed to prove, under Title VII and the ADEA, that her termination was pre-textual, based in whole or in part on discrimination, or that discrimination was a "but-for" cause of her termination. Plaintiff has failed to show that discrimination on the basis of religion or age was even the smallest factor in her termination.  Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment with respect to Plaintiff's Title VII, ADEA and NYSHRL religious and age discrimination claims against the District and the School Board.

### C.     Plaintiff's Hostile Work Environment Claim

Finally, Plaintiff claims that "the record reflects that Plaintiff was repeatedly summoned into meetings with Dr. Mazza and Dr. Gately for the sole purpose of berating Plaintiff and repeatedly telling Plaintiff to resign from her position in lieu of being terminated. When viewed cumulatively, the frequency and severity of the harassment was such that it materially altered Plaintiff's work environment for the worse."  Pl. Mem. at 16.  According to Plaintiff, she "has sufficiently demonstrated that the treatment she received was consistent with Defendants' treatment of Jewish and/or older employees at the District and/or School who were repeatedly targeted and subjected to adverse action in an effort to strip them of their positions with Defendants."  *Id*. at 17.  However, as noted by Defendants, "Plaintiff does not allege a single incident of age or religious-based hostility. On the contrary, she admits she has never heard Dr. Mazza, Dr. Gately, Dr. Kanas, or anyone else say anything disparaging about age or Judaism."  Def. Mem. at 20 (citing Ex. B pp. 35, 164-65; C pp. 82-84).

"'In general, to prevail on a hostile work environment claim, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Thompson v. Spota*, No. CV 14 2473 JMA AKT, 2018 U.S. Dist. LEXIS 144676, 2018 WL 6163301, at *32 (E.D.N.Y. Aug. 23, 2018).  Moreover, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or her] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  The plaintiff must show not only that the plaintiff subjectively perceived the environment to be abusive but also that the conduct complained of is "severe and pervasive enough that a reasonable person would find it

hostile or abusive." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015).  "It is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's [protected characteristic]." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

In this case, Plaintiff has not adequately alleged the existence of a hostile work environment.  There is no evidence that Plaintiff was subjected to even a single episode of objectively abusive or hostile comments, ridicule, or insults, let alone with the physical threats, frequency, or severity necessary to rise to the level of a hostile work environment.  *Boyd*, 160 F. Supp. 2d at 541-42. In support of her claim, Plaintiff relies entirely her allegation that a pattern and practice existed at the District to target Jewish and/or older employees and subject them to adverse employment actions.  However, as discussed above, there is no factual support for this allegation and therefore she has failed to raise a genuine issue of fact that she suffered an objectively hostile work environment on the basis of her religion or age.  There are no instances of  anyone ever saying or doing anything that was in any way indicative of age or religious discrimination.  Indeed, the standard for a hostile work environment claim is demanding – a plaintiff must prove that the conduct was so "'offensive, pervasive, and continuous' to amount to a constructive discharge." *De La Rosa v. City of N. Y. Police Dept.*, No. 09 Civ. 5290 (SAS), 2010 WL 4177626, at *1 (S.D.N.Y. Oct. 22, 2010), *aff'd*, 461 F. App'x 73 (2d Cir. 2012). Relevant factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)  Here, Plaintiff has failed to identify any such facts and relies instead on an allegation that bi-weekly meetings suggesting she resign rather than be

35

termination caused anxiety so severe that she was absent from work more than any other year of her employment at the School.  Pl. Mem. at 17.  However, nothing about these meeting suggests a discriminatory motive.  Indeed, Plaintiff admitted, that teachers generally resign in lieu of a tenure denial, as it increases their prospects of future employment.  There simply are no facts which rise to the level of severity required to state a claim for hostile work environment.  Accordingly, the undersigned respectfully recommends that Defendants' motion for summary judgment with respect to Plaintiff's hostile work environment claim also be granted.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the Court via ECF.  Any requests for an extension of time for filing objections must be directed to Judge Seybert prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:  Central Islip, New York
        February 27, 2023

                        _____/s_____
                        ARLENE R. LINDSAY
                        United States Magistrate Judge